UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

HELEN GORE,

               Plaintiff,               Case No.: 05-CV-71966

vs.                              HON.  ARTHUR J. TARNOW
                              MAG. WALLACE CAPEL, JR.

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.**      **RECOMMENDATION**

It is recommended that the Court grant in part and deny in part Plaintiff's Motion for Summary Judgment, deny Defendant's Motion for Summary Judgment, and remand this case to the Secretary for further proceedings.

**II.**      **REPORT**

This is an action for judicial review of two final decisions by Defendant Commissioner denying Plaintiff's applications for disability insurance benefits [DIB] and supplemental security income benefits [SSI].  Plaintiff has a dual application and two separate SSI applications.  (TR 1569-70).

Plaintiff initially filed an application for DIB on August 2, 1993, and also filed an application for SSI on May 2, 1994.  (TR 170-73, 270-73).  She allegedly became disabled on June 15, 1993, (TR 170, 270, 1048), due to post traumatic stress disorder, agoraphobia, anxiety, migraine

1

headaches, multiple sclerosis [MS], lower back problems (spondylothesis), arthritis in her neck and back, leg problems, asthma, emphysema, chronic obstructive pulmonary disease, and depression. (TR 270). Both claims were denied initially and on reconsideration. (TR 178-79, 182-83, 486-88). A hearing was held on December 5, 1994, before administrative law judge [ALJ] Anthony Fava. On May 11, 1995, ALJ Fava issued a decision denying Plaintiff's claims. (TR 332-47). Plaintiff requested review by the Appeals Council on June 14, 1995. (TR 348-49). The request was granted on September 27, 1996, and the Appeals Council remanded the case based on ALJ Fava's failure to consider additional evidence that Plaintiff submitted after the hearing, but prior to the issuance of the administrative decision. (TR. 450-51). Thereafter, the case was reassigned to ALJ Kathleen T. Donahue. (TR 891-904).

In the interim, Plaintiff filed another SSI application on August 1, 1995. (TR 504-06). Plaintiff again alleged that she was disabled on June 15, 1993 (TR 504), due to chronic obstructive pulmonary disease, asthma, emphysema, lower back pain, post-traumatic stress disorder, mental anguish, and past drug addictions. (TR 515). Plaintiff's application was denied initially and on reconsideration. (TR 486-88, 494-96.) Separate hearings were conducted by ALJ Donahue on April 1, 1997, and June 9, 1997; however, both hearings related to the initial DIB and SSI applications on remand to the ALJ and to the new SSI application.[1] (TR 25, 891).

On June 25, 1997, the ALJ issued two separate decisions to address (1) the original applications for DIB and SSI; and (2) the subsequent SSI application. (TR 25, 891). In nearly identical written opinions, the ALJ found that Plaintiff retained the residual functional capacity

---

[1]ALJ Donahue did not learn of Plaintiff's new SSI filing until April 1, 1997, the date of the first scheduled hearing on the remanded SSI and DIB applications. (TR 135).

2

[RFC] to perform her previous light work which included the following restrictions: no repetitive twisting or turning of the neck, no frequent bending at the waist, no overhead reaching, and no frequent lifting over ten pounds.  (TR 36-37, 903).  Accordingly, the Plaintiff was found not disabled.  (TR 37, 903).  The Appeals Council denied her request for review on October 5, 1998, despite Plaintiff's submission of additional medical evidence pertaining to a confirmatory diagnosis of multiple sclerosis.  (TR 10).   The ALJ's decisions were thus the final decisions of the Commissioner.

The cause was remanded on March 31, 2000, by Judge Tarnow.[2]  (TR 1026-27).  On February 19, 2002, the Appeals Council issued an Order vacating the prior decisions and remanding the case to the ALJ.  (TR 1005-06).  Hearings were conducted by ALJ Donahue on November 26, 2001, and January 16, 2002; however, both hearings related to the initial DIB and SSI applications on remand to the ALJ and to the new SSI application.  (TR 25, 891).

On December 24, 2003, the ALJ issued two separate decisions to address (1) the original applications for DIB and SSI and (2) the subsequent SSI application.  (TR 986-1004, STR 1022-39[3]).  In nearly identical written opinions, the ALJ found that Plaintiff retained the RFC to perform her previous light work with the following restrictions:

> stand/walk six hours in an eight hour work day, sit six hours in an eight hour workday with a sit/stand at will option, with no repetitive bending, twisting or turning of the claimant's neck or body trunk; no unprotected heights; no work around machinery one could fall into; a relatively clean air environment, no frequent lifting of over ten pounds; and simple, repetitive tasks.

---

[2]See Case No. 98-75092; Docket Entry Nos. 18 & 19.

[3]See Case No. 05-71966, Docket Entry No. 18 (Supplemental Transcript [STR] Filed December 12, 2005)

(TR 1002, 1004, STR 1037-39).  Accordingly, Plaintiff was found not disabled.  The Appeals Council denied her request for review on April 29, 2005, thereby making the ALJ's decisions the final decisions of the Commissioner.  (TR 914-17).

A.    **TESTIMONY**[4]

1.    **Plaintiff's Testimony:  April 1, 1997**

Plaintiff was born on August 28, 1958, and was 38 years old at the time of the hearing.  (TR 366).  She lives in Lincoln Park, Michigan, with her ten year old daughter.  (TR 106, 111-12).  Plaintiff did not complete the tenth grade; however, she is literate and had vocational training as a medical office assistant.  (TR 107-108).  Prior to June 15, 1993, Plaintiff worked jobs as an activities director at a retirement home, medical assistant, fast food manager, and a medical coordinator.  (TR 113-118).  She had difficulty providing a time line of her employment history.  Id.  Plaintiff's household income is derived from food stamps and child support payments made by her ex-husband.  (TR 111-12).

Plaintiff testified that she was forced to quit her job as an activities director in June 1993 because "she could not keep up." (TR 112).  In addition to "borderline personality disorder" and post traumatic stress disorder, Plaintiff testified that asthma, headaches, dizzy spells, and pain in her legs and lower back prevented her from working.  (TR 109).  She also cited anxiety, emphysema, and depression as contributing to her disability.  (TR 110).

Plaintiff testified that primarily severe leg pain prevents her from working.  (TR 120).  She has apparently experienced back and leg pain since 1979.  (TR 121).  The back and leg pain cause

---

[4]Plaintiff's testimony during recent hearings has been omitted to the extent that it repeats any information.

4

"burning" and "trembling" in both legs, which impairs her ability to stand, walk, stoop, and reach. (TR 109, 124). Plaintiff was first diagnosed with emphysema in 1993. (TR 121). She testified that she has trouble breathing when exposed to perfume, soap, deodorants, or dust. (TR 122). Plaintiff's asthma has also contributed to her breathing problems since 1988; her condition has worsened since her crack addiction in 1993. (TR 121, 123). Plaintiff also admitted that she smoked a pack of cigarettes per day until August of 1996. (TR 122).

Plaintiff testified that she has experienced problems with anxiety since 1974. (TR 121-22). She stated that "being out in public" can trigger her anxiety. (TR 122). Plaintiff has also suffered from headaches since 1994 that prevent her from working because it is "hard to be around light, noise, [or other] movements." (TR 124). Finally, she testified to an inability to control her emotions or thoughts due to depression beginning in 1993. (TR 124-25).

### 2.    Plaintiff's Testimony:  June 9, 1997

Plaintiff testified that she takes the following asthma medications: Preventil, on an hourly basis; Theo-Dur 300, twice a day; Serevent, twice a day; Asthmacort, twice a day; Nasacort twice a day; and Pelorami, twice a day. (TR 144). She also uses a home nebulizer machine for ten minute treatments, twice a day, with more frequent treatments over the summer. Id. Her recovery after an asthma attack can take "minutes" or up to an hour. (TR 144-45). Plaintiff estimated that she has approximately ten asthma attacks a month that require a recovery time of greater than thirty minutes. (TR 145). She stated that stress, congestion, and walking up and down stairs can also cause an asthma attack. (TR 145-46). Plaintiff estimated that she can walk a half block without slowing down due to shortness of breath. (TR 146).

With regard to her headaches, Plaintiff testified that the pain is located in the middle of her

head to about the temple.  Id.  These headaches apparently occur at least five times per month, and last between three and eight days.  (TR 147).  To relieve the pain, Plaintiff takes Motrin or Tylenol, retreats to a dark room, and places cold-packs on her forehead.  (TR 147-48).  She opined that the headaches are caused by crying, "sinus buildup," and stress.  (TR 147).

Plaintiff also stated that her back pain is centered near the tail bone.  (TR 148).  On a scale of ten, she estimated the pain to be a "ten plus."  Id.  As a result, Plaintiff testified that she could stand for approximately five minutes without sitting down.  (TR 149).  She stated that she often adjusts herself while sitting, and she must walk, stretch and bend periodically for ten minutes to relieve pain.  Id.  Plaintiff also described a constant "ach[ing]" in her right "hip bone" and leg that makes walking difficult.  (TR 150).  She stated that tremors develop in her right ankle when her leg is elevated.  Id.  The tremors apparently develop into a "bad cramp" ranging from the upper- middle portion of her leg once or twice a year.  Id.  Plaintiff has not experienced leg cramps since she moved into a single level residence.  Id.  She later stated; however, that radiating hip pain in her right leg occurs "every night" and lasts ten to fifteen minutes.  (TR 161-62).  Similarly, she has pain during the day caused by "walking."  (TR 162).  Plaintiff has experienced this pain for ten years. Id.

Plaintiff testified that she does not trust people, and she suffers anxiety from being around others that she might know while in public. (TR 150-51.)  Although she is often encouraged to leave the house, when she is in public, she "wishes" to return home.  (TR 151).  Plaintiff does not feel comfortable leaving the house alone, and she opined that her inability to function normally outside the home contributes to her depression.  (TR 151-52).  While feeling depressed, Plaintiff  isolates herself for twenty to thirty minutes, and she stated that she cries three to four times per day.  (TR 152).  A "chore provider," who visits her home three to five days per week for three to four hours

per visit, cleans, cooks, shops, and does yard work (TR 153-54, 160). Plaintiff herself performs little housework other than "wash[ing] a few dishes." (TR 155). Plaintiff also testified that her memory is a "problem," and that she cannot recall movies that she has watched. (TR 154).

Plaintiff also testified that she has suffered from "dizzy spells since... August [1996]." (TR 157). The symptoms are intermittent and alter her equilibrium. Id. She described the spells as equivalent to "an ear infection without the pain." Id. Plaintiff stated that objective medical testing has not verified her dizzy spells. Id. She feels that her physician, Dr. J. Perlson, M.D., believes her dizzy spells and back pain "[are] all in [her] head." Id.

At the time of her alleged onset date, Plaintiff testified that she could not perform her job due to back pain and difficulty breathing. (TR 159). Plaintiff stated that, as an activities director at Morton View, she played cards, "colored," curled hair, and "walked around the back yard" with ambulatory retirees. (TR 158-59). The job was specifically created for Plaintiff by her sister. (TR 158). She reiterated that it was "mainly" her "breathing" and back pain that resulted in her inability to work as scheduled. (TR 158-59). As a result, Plaintiff was finally asked to quit or be fired. (TR 158). She testified that she was not using illegal drugs during this period. (TR 158). Plaintiff has not driven her car since 1996 and has not worked since June 1993. (TR 159, 160).

### 3.    Plaintiff's Testimony: March 18, 2002

Plaintiff testified that when she was an activity director a full-time aid was present when she interacted with the residents. (TR 1698). She stated that she played simple card games with the residents and that she also helped four or five residents bake cookies at times. (TR 1699). She stated that she simply supervised or directed them regarding cooking and activities. (TR 1699-1700). She stated that she cut down on hours because she "couldn't handle it." (TR 1700).

7

She stated that she did not recall her employment prior to that position and that there was a time when she was not employed and her husband provided for her.  (TR 1701).

She stated that she abused crack, but not other drugs.  Id.  She stated that she drank, but she was not an alcoholic.  (TR 1701-02).  She stated that she used alcohol like a pain pill.  (TR 1702).  She stated that she is not currently drinking and cannot remember when she last had an alcoholic beverage.  Id.  She testified that her crack addiction cost her $100 at a time.  Id.  She stated that she did not use it everyday but would use it when she needed energy.  Id.  She stated that she might use it for three days in a row, but then go a month or two without using it.  Id.  When asked whether crack interfered with her ability to work, she stated that it gave her energy to work, but then she would be "down" for two days.  (TR 1702-03).

Plaintiff testified that she is currently receiving counseling, as she has been for the past few years.  (TR 1703).  She stated that she still lives at home with her fifteen-year-old daughter.  (TR 1703-04).  She stated that she and her daughter have lived alone since 1993 and that her daughter has had to do a lot of things for herself.  Id.  She stated that she also had friends, family, and a chore provider that helped her during that time.  (TR 1704-05).  Prior to 1993, Plaintiff stated that she and her husband cared for her daughter.  (TR 1704).  After her husband left, her nephew and his wife stayed with her for a year and helped care for her daughter as well.  Id.

Plaintiff clarified earlier testimony regarding a recent fall, stating that as she was walking up the steps to her house, she reached for the railing and missed.  (TR 1705).  She stated that she fell on the railing, hit her eye, and broke her nose.  Id.

She stated that she has also been to the emergency room twice recently, once at the beginning of the year and once the week prior to the hearing.  Id.  She stated that her bowels shut down and

8

she had to go in for treatment.  Id.  She stated that she stayed about eight days on the first occasion and was sent home the second time.  (TR 1705-06).  She stated that when she was sent home the second time, she was still not feeling well and went to Heritage Hospital.  (TR 1706).  She then returned home and eventually ended up visiting her father "up north," because she could not take care of herself.  Id.

Plaintiff testified that she was still having breathing problems and difficulty with her asthma. Id.  She reported that she was still using her breathing machine once or twice per day, for ten minutes at a time, every morning and then as needed.  (TR 1706-07).

Plaintiff testified that she had a migraine at the hearing and if she was not there, she would have gone to the doctor's office. (TR 1707).  She testified that she gets headaches often; however, apart from her Avanaz injections,  she is not on any other pain medications.  Id.  She explained that her medications have been restricted because they did not know "which one had shut [her bowels] down," so she is "seeing the neurologist once a month to be evaluated for [her] medications."  Id.

She testified that she takes a stool softener once in the morning and twice at night, as well as Zantac twice a day.  Id.  She then testified that she can take Tylenol for her headaches, Esjic or Fiorinal if she has a severe headache, or go to the doctor's office for an injection.  Id.  She stated that she cannot take Compazine or Flexeril.  (TR 1707-08).

Plaintiff testified that she was wearing an ace bandage on her left wrist due to symptoms caused by either tendonitis or her MS.  (TR 1708-09).  She stated that her doctor had not determined which of the two was the cause.  (TR 1709).  She stated that she had not slept the previous night due to her headache and the pain in her wrist.  Id.  She stated that she has problems with both hands, but her left hand is worse.  Id.  She stated that the problems began a few years ago, and she started

9

treating with Dr. U, but now treats with Dr. Voci.  Id.

### 4.    Plaintiff's Testimony:  November 26, 2001

Plaintiff testified that she was born on August 28, 1958, and was forty-three years old at the time of the hearing and had completed the ninth grade.  (TR 1575-1576).  She reported that she had vocational training as a medical office assistant in 1986 and that she last used her training during employment in 1989.  (TR 1576).  She indicated that she last worked for pay in 1991, but she did not recall which month.  Id.  Plaintiff then stated that she had problems with her memory and with her attorney's assistance, testified that she last worked on June 15, 1993, as an activities director, ten and then two hours a week.  (TR 1576-77, 1614).

She stated that her sister created the activities director position for her.  (TR 1614).  She stated that she played games with the residents, sang songs, polished nails, and dressed up as a clown from 1991 to 1993.  (TR 1615).  She stated that she had to stop doing the resident's nails because she had breathing difficulty.  Id.  She testified that she her sister had to "let [her] go."  (TR 1614).      Plaintiff testified that she worked as a nurse's aide at Mary Rose Beachwood Living Center and Baptist Park Nursing Home.  (TR 1615).  She stated that she was basically a "babysitter" and helped the residents get dressed and to the kitchen table to eat.  (TR 1615-16).  She testified that she fed them, washed them, and lifted them into bed.  (TR 1616).  She explained that she hurt her back at Baptist Park pulling a man into an ambulance.  Id.

Plaintiff testified that she has always worked part-time due to her lower back and breathing problems.  (TR 1577).  However, she stated that her job as fast food manager in 1982 was full-time. Id. Plaintiff testified that in 1989, she worked part-time, twelve hours a week, for Dr. Mahajah, as

10

a medical assistant.[5] (TR 1578). She stated that she thinks she worked as a medical coordinator in 1984, but that her multiple sclerosis [MS] is interfering with her memory of same. Id. She stated that, as a teenager, she worked at Lawson's and Rubbermaid as a teenager, and then worked as a cashier at Wendy's and Burger King. (TR 1617). She stated that she was a manager at Little Caesar's and that it was very strenuous work with heavy lifting. Id. She stated that she only weighed ninety-six pounds working there and had to leave when she was so sick that she was rushed to the hospital. Id.

Plaintiff testified that when employed she did not have problems getting along with her boss, coworkers, or customers. (TR 1612). She stated that she does not have problems getting along with friends, family, or neighbors. Id. Plaintiff testified that she does have difficulty handling stress and pressure. Id. She stated that she has trouble making decisions and cries every day, three to five times. (TR 1612-13, 1627). She stated that the crying spells take about twenty minutes to get under control and are caused by frustration relating to things she used to be able to do but no longer can. (TR 1628). She stated that she is unable to understand, remember, and carry out simple instructions, and she forgets things. (TR 1613).

Plaintiff stated that she is still living with her fourteen-year-old daughter and is divorced. (TR 1578). She reported that she receives $452 a month in child support, and that is her entire income. Id. She stated that they live in a one-story house with a basement. (TR 1579). She stated that she is not currently driving, and she cannot remember the last time she drove. Id. She stated

---

[5]She testified that she worked for the doctor for less than a year because she had to take care of her asthmatic daughter. (TR 1617).

that she still has a chore worker who comes to her home at least three days a week.[6] Id.  She stated that the chore provider cooks for her as well.  (TR 1613).

Plaintiff testified that Dr. Pearlson is her primary care physician.  (TR 1574-75).  Plaintiff testified that she treated with Dr. Burman, a psychiatrist, in 1989.  (TR 1601).  She stated that Dr. Vocci has been her treating neurologist since 1997 for her MS.  (TR 1579).  She stated that prior to that she treated with Dr. Thomas U for same.  (TR 1580).

Plaintiff stated that, in addition to her MS, her asthma, chronic obstructive pulmonary disease, migraines, low back pain, and leg pain keep her from being able to work.  Id.  In terms of her MS, she reported that the following impairments keep her from working:  memory loss; migraines; the tingling in her hands, head, and face; problems with eye sight; stuttering; concentration; and arm, as well as hand, spasms.  Id.  She stated that she also has spasms in her legs and will accidentally kick things.  Id.

She also stated that things fly out of her hands uncontrollably, because she has carpal tunnel syndrome symptoms that are caused by her MS. (TR 1581).  Id.  She stated that it is not actually carpal tunnel, but she has used braces to immobilize her hands.  Id.  She explained that she has a loss of balance and uses a walking stick now, but it does not always help.  Id.  She stated that she has been using same for about three months, but never used one before.  (TR 1601).

Plaintiff stated that she can only walk the length of around five houses before she has to stop, and even walking from the car to the house sometimes gives her problems, sometimes due to shortness of breath.  (TR 1602).  She stated that after "walking five houses," she'll sometimes sit on the sidewalk for five minutes;  she might then be able to walk five more houses, but she usually

---

[6]She stated that she has had a chore provider since 1993.  (TR 1618).

heads back home.  Id.  She stated that she has had this type of difficulty walking for the past nine

years.  (TR 1603).  She indicated that her shortness of breath relating to same is caused by her

asthma.  (TR 1602).

She testified that she has an asthma attack three times a week at home and more if she goes

out.  (TR 1618).  Plaintiff explained that she is experiencing more asthma attacks in the middle of

the night.  Id.  She stated that when one occurs, she feels tightness in her chest and cannot breathe.

(TR 1619).  She stated that the attacks lasts until she uses her Proventil and nebulizer.  Id.  She

stated that she has to wait about a half hour before she can do anything.  Id.  She stated that grass,

diesel fuel, detergent, perfumes, shampoos, and stress all trigger her asthma.  Id.  She stated that this

has been the same since 1993 when she started getting treatment for same.  (TR 1619-20).

Plaintiff testified that, if she can shift her weight from side to side, she can stand for a

maximum of five minutes.  (TR 1603).  She explained that she cannot balance at all on one foot, and

she is unable to stand for more than five minutes because she experiences "burning pain in [her]

legs."  Id.  She reported that she has had this problem standing since 1978 when she hurt her back

at Baptist Park Nursing Center.  Id.  She stated that she could sit in a chair for up to an hour or

"maybe a little longer," but she usually gets up.  Id.  She stated that she will get up and walk around

for a few minutes after sitting, then lay down for about twenty minutes.  (TR 1604).  She stated that

she cannot climb stairs.  Id.  Beginning in 1994, after she was injured, Plaintiff reported that she can

no longer lift or carry any weight.  Id.  Plaintiff reported that she has a hard time grasping small

objects due to her coordination, or lack thereof.  (TR 1604-05).

She reported that she falls frequently, and that she dislocated her nose after falling and hitting

the wrought iron railing on her porch about two and a half weeks prior to the hearing. (TR 1581).

13

Further, she stated that she experiences excruciating pain in her hands and in back of her legs.  Id.
She stated that she also has problems swallowing and chokes often.  Id.  She repeated that she no
longer drives.  Id.

Plaintiff explained that she made a list of things that have been bothering her for a long time
in preparation for the hearing.  (TR 1581-82).  She stated that it took her a few days to compile the
list.  (TR 1581).  She stated that some days her problems are worse and other days they are
controllable.  (TR 1582).

Plaintiff stated that she has not had an electromyography [EMG] for her hands and legs yet.
(TR 1582).  Plaintiff stated that she takes an injection once a week ever since she was diagnosed
with MS.  Id.  She explained that she was given the choice is of three different medications.  (TR
1583).  She could not take the first one due to her prior suicide attempt, and she declined to take the
second one, because it can cause heart attack symptoms.  Id.  She opted for the once a week
injection, although she does get sick when she takes it, and two to three days out of the week she
also has flu symptoms relating to same.  Id.  She explained that she and her friend researched the
medications on her friend's computer in 1998.  (TR 1583-84).  She stated that she did not write
down the information, but printed it out, and she recalls when she did the research.  (TR 1584).

Plaintiff stated that she is still taking Depakote for seizure-like symptoms, which she takes
three times a day.  Id.  She also takes Amandadine, which she started taking at the same time, to help
with energy.  Id.  However, she reported that the next time she sees the doctor, they may take her
off of that particular medication because it doesn't appear to be helping.  (TR 1584-85).  Plaintiff
stated that she has been on Paxil for anxiety, panic attacks, and depression for the past month.  (TR
1585).  She also reported that she takes Restoril because she could not sleep.  (TR 1585, 1629).  She

stated that the night before the hearing she only slept a half hour, but that it not a typical night, because she was nervous.  (TR 1629-30).  She explained that she started taking Restoril when she began her injections for her MS.  (TR 1585).  At the same time, she started taking Flexeril.  Id.  She stated that she takes two Restorils at night and can sleep up to four hours.  (TR 1630).  However, she stated that she is up three to four times a night to got to the bathroom, even when taking Ditropan.  Id.  She stated that Ditropan does not affect her the next day, but the lack of sleep requires her to take a nap between one and three in the afternoon.  (TR 1630-31).  She stated on the nights that she takes her injections, she just sits up and cries.  (TR 1630).

Later, Plaintiff began using Ditropan for bladder control for about two years. (TR 1586). She stated that she has been taking Esjic-Plus for headaches for "a long time."  (TR 1586, 1621).  She stated that the medication helps, but she has to lay down in her room in the dark to sleep.  (TR 1621).  She started taking Compazine at the same time as Esjic-Plus for nausea cased by the headaches.  (TR 1586).  She stated that she was currently on Cipro, due to asthmatic bronchitis.  Id. She stated that it is an antibiotic and she does not take it all the time.  Id.  However she stated that is the second antibiotic that they have tried, and she is still sick.  (TR 1587).  She stated that she also uses inhalers and a nebulizer two times a day.  Id.  She stated that she uses the nebulizer for ten minutes at a time.  Id.

Plaintiff testified that she took regular Tylenol prior to her MS diagnosis as well as her asthma medication.  (TR 1624).  With her counsel's help, Plaintiff recalled taking Norgesic, Motrin 800, Tylenol 3, Naprosyn, and Advil for pain as far back as 1993.  (TR 1625).  She stated that she also took Zoloft, Xanax, and Elavil for psychiatric treatment.  Id.  Plaintiff testified that she has been receiving psychiatric treatment as far back as 1989.  Id.  She stated that she started treatment with

15

Dr. Burman, then treated with Judy Malanowski, a licensed psychologist, for a couple years.  (TR 1625-26).  She stated that she treated with her one-on-one as well as in support groups.  (TR 1626).  She stated that she then treated with "Christine" for a short time at Eastwood Clinic.  Id.  She stated that she treated with someone else as well, but cannot recall her name.  Id.  She stated that she is currently treating with "Joanne" at Community Care Services in Taylor.  Id.  She stated that she has been treating with Joanne for a couple years, and she also saw a psychiatrist, who did not want to start her on a new medication and deferred to her neurologist for same.  (TR 1626-27).

Plaintiff stated that she has some side effects from her medications.  (TR 1587).  For example, she stated that she gets nervous and shakes from her asthma medications.  Id.  She stated that after using same, she is nervous for a couple hours.  Id.  She stated specifically that it is the inhalers and the nebulizers that cause these problems.  Id.  Further, she stated that when she uses a nebulizer at night, she stays awake for most of the night and Restoril does not help.  Id.  She explained that the nebulizer and Proventil inhaler cause her to be nervous.  Id.  However, none of the other medications cause her nervousness.  Id.

Plaintiff testified that she quit smoking four years ago.  (TR 1587-88).  She stated that she does not drink or do drugs.  (TR 1588).  Further, she stated that she is not abusing narcotic medications.  Id.  She stated that she last used illegal drugs in February 1993.  (TR 1628).

Plaintiffs stated that she last saw a doctor for her vision problems three years ago.  (TR 1588).  She stated that her vision is impaired due to eye damage caused by a robbery and by problems associated with her MS.  Id.  She explained that she was robbed coming out of Kroger's.  Id.  She stated that a man punched her twice in the eye and grabbed her purse, then left.  (TR 1589).  She stated that this was a separate incident from the time she was held up at knifepoint.  Id.  She

16

stated that after the robbery, she had nerve damage, and when she touches her lip, she feels it in her

eye, and when she touches her eye, she feels it in her lip.  Id.  She stated that no one was with her

at the time, and that she had driven to the store by herself.  Id.  She stated that the store was across

the street and that the incident occurred about three or four years prior to the hearing.  Id.

She stated that she was driving very little at that time, only to local places.  Id.  She stated

that she frequents a Farmer Jack's and CVS that are across the street from her.  Id.  Plaintiff stated

that the incident, in which she was held up by knife point was prior to the robbery.  (TR 1589-90).

When asked about the incident, plaintiff stated that she tries to block things out as a result of her

post-traumatic stress disorder.  (TR 1590).  She testified that when she was assaulted at knifepoint,

she was with a friend named Rusty, driving to get doughnuts.  Id.   However, Plaintiff indicated that

she did not drive very often between 1996 and 1999.  Id.

Plaintiff stated that her blurred vision began about a year after her MS diagnosis.  (TR 1590-

91).  She stated that she loses her vision "a lot" for a few days at a time.  (TR 1591).  She explained

that when this happens she might see only half of a person.  Id.  She stated that her vision returns

after three days at the longest.  (TR 1592).

She testified that she has friends that stop by at least once a month to check on her and stay

for an hour.  Id.  She stated that her friends may take her out to lunch to "try to get [her] out of the

house."  Id.  She also stated that in the alternative her father will stop by every week.  Id.

Plaintiff indicated that she is able to bathe, dress, and feed herself, but she has a hard time

in the shower.  Id.  She explained that she uses a shower chair because she gets dizzy when she

closes her eyes.  Id.  She added that she also gets dizzy in the dark, when she stands up, or turns

around.  (TR 1592, 1629).  She stated that in 1994 she would fall when going up and down stairs,

but she moved to a one-story home.  (TR 1622).  She stated that she still has leg tremors.  Id.  She stated that she falls "quite a bit."  (TR 1629).  She stated that she has no balance on one foot and her problems relating to dizziness have not changed since 1997 and now.  (TR 1622, 1629).  She stated that the doctors have determined that her MS is causing the dizziness.  (TR 1623).  She stated that it is similar to flu symptoms with a "real bad fever."  (TR 1628).

Plaintiff testified that she has a headache almost everyday, lasting one to three days.  (TR 1605, 1621).  She stated that she also has pain under her left eye where her nose was recently broken.  (TR 1607).  She stated that her headache pain is a twelve on a scale of one to ten with ten being pain that would need emergency room treatment.  (TR 1610).  She explained that these began when she was assaulted by Scott on March 9, 2003.   (TR 1620).  She stated that the pain is above her right eye.  Id.  She stated that the pain is also on her side and into her back , neck and shoulders.  Id.  She explained that they cause nausea and are "full-blown" migraines.  Id.  She stated that her migraine headaches still occur a couple times per months, lasting multiple days, and have increased with the changes in the weather.  (TR 1621).  She stated that stress also causes same.  Id.

In addition Plaintiff stated that she has left elbow and hand pain, as well as pain in her legs and lower back.  (TR 1607).  She stated that she sleeps with braces on every night, and her left hand hurts every day.  Id.  She stated that she has been using the braces for about a year.  Id.  She stated that she wears them during the day, too, when necessary.  (TR 1609).  She stated that if she puts her brace on her left hand and immobilizes it, the pain in her left hand lasts about an hour.  Id.  Otherwise, she stated that the left hand pain increases until she uses the brace.  Id.  She stated that her left hand pain is excruciating and reaches the level of twenty on a scale on to ten.  (TR 1611).  She stated that her right hand is not as much of a problem.  (TR 1610).  She stated that she uses the

18

brace in the same way as the left to relieve the pain.  Id.  She stated that the right hand pain is an

eight on a scale of one to ten.  (TR 1611).

　　　She stated that she has constant back pain, which began in 1978 when she injured same at

a nursing home.  (TR 1608).  She stated that her back pain is a ten on a scale of one to ten.  (TR

1610).  She reported that she has leg pain every day.  (TR 1608).  She reported that taking a shower

and get her daughter up and ready for school causes her leg pain.  Id.  She stated she lays back down

until noon after her daughter leaves for school and that her leg pain lasts about a "couple of hours."

(TR 1608-09).  She stated that her leg pain is an eleven on a scale of one to ten.  (TR 1611).  She

stated that her back pain is "[l]ike an aching toothache" in her hips and tailbone, and it radiates down

her legs.  (TR 1623).  She stated that the Esjic also helps a little bit with her back pain, although it

is mostly for her headaches.  (TR 1623-24).

　　　Plaintiff testified that her medication does not relieve all of her pain, but relieves some.  (TR

1611).  She stated that it takes about an half an hour to work and then last two to three hours.  Id.

She stated that she cannot take more medication for six hours.  Id.  She stated that she takes the

Esjic-Plus and Flexeril for pain.  (TR 1611-12).  She reported that after taking Esjic-Plus for her

headache pain, her pain subsides to an eight.  (TR 1612).  She stated that the medications do not help

with her left hand or back pain.  Id.  She reported that it reduces her leg pain to a five or six and her

right hand pain to a four or five.  Id.

　　　She stated that she also has anxiety attacks everyday, which last 20 minutes to a half hour.

(TR 1605-06).  She stated that during this time she tries to calm herself down or her daughter calms

her down.  (TR 1605).  She stated that she may have more than one anxiety attack per day.  (TR

1606).  She stated that four or five days out of the week she has three anxiety attacks, but there are

19

days when she only has one.  (TR 1606-07).

She stated that she is currently taking Paxil which replaced her Pamora.  (TR 1624).  She explained that the Pamora was for headache prevention as well as for depression and anxiety.  Id.

Plaintiff stated that she does not do anything around the house, go shopping, go to church, go to the movies, or go to restaurants.  (TR 1593).  She stated that her chore provider takes her to and from her doctor's appointments.  Id.  She stated that she could not recall the last time she went shopping.  Id.  She stated that she watches television for a couple hours a day, and she keeps the television on throughout the day so that she does not feel alone.  Id.

Plaintiff testified that she has anxiety and panic attacks when she goes out in public.  (TR 1593-94).  She explained that as soon as people crowd around her, the attacks begin. (TR 1594).  She stated that a crowd could be five or ten people in a room as large as the OHA hearing room. (TR 1595-96).  She stated that the attacks began in 1999, after she was robbed; however, she also had problems with same when she was younger, but they had stopped for a while.  (TR 1594-95).  At this time during the hearing, Plaintiff indicated that in 1970, she was robbed at Lawson's.  Id.

Plaintiff testified that she suffers from posttraumatic stress syndrome, which was diagnosed in 1989.  (TR 1596).  She explained that she was molested by a family member and by another man when she was ten years old.  Id.  In addition, she worked at a nursing home where the activity director was killed by a resident.  Id.  She also stated that being robbed brought on post-traumatic stress.  Id.  Plaintiff stated that she has nightmares and flashbacks from the robbery and when her friend was shot.  (TR 1599).  She stated that she has a hard time watching television because "[i]t's all you see on TV."  Id.

Plaintiff testified that a friend was shot inside her car in 1993, but she has blocked out most

20

of the event.  (TR 1596-97).  However, she stated that she "could see one person but all [she] could

see was he had jerry curls and he had on a white jacket and a white hat."  (TR 1597).  She then stated

that she

> had taken [her friend] to an AA meeting and when [they] had left the AA meeting
> [she] got to the corner of Dicks and Council [phonetic] and two black men came up
> to the truck and asked if [they] wanted to buy any dope and [her friend] says no,
> we're clean, man. [Her friend] just got out of an AA meeting and then [she] heard
> [her] friend say get out of here and then [she] heard pop, pop and [she] didn't even
> know what it was and then as [they] - - [she] turn[ed] the corner he says I think that
> m f'er shot me and when [she] looked at him, his face was completely in blood.

Id.  She stated that she did not taken him to the hospital, but to his house to see his mother in case

he died.  Id.  She told them to call an ambulance once she arrived.  (TR 1598).  He survived.  (TR

1597-98).  When asked whether she goes out, Plaintiff indicated that since 1993, she only goes to

her family's home.  (TR 1598).  She stated that she had a boyfriend for about a year in 1997.  Id.

She stated that he came over once or twice a week and that she met him through a friend.  Id.

       Plaintiff stated that she has had a closed head injury.  (TR 1599).  She testified that Scott,

her friend who was shot, caused the injury.  Id.  She explained that she ran into him after her divorce

and went to an AA meeting with him.  Id.  He started using drugs again and she told him she did not

want to see him anymore.  Id.  She explained that became very angry when she told him on one

occasion that he could not come into her home.  (TR 1600).  She stated that her daughter was in the

house, so she just sat in her car and told him to go or she would call the police.  Id.  She testified that

he smashed her head against the dashboard.   Id.  She testified that this all after he was shot and

occurred in 1993 or possibly 1994.  (TR 1600-01).

       Plaintiff testified that she also has had neck pain relating to her closed head injury since

1994.  (TR 1602-03).  She stated that they thought Scott had broken her neck.  (TR 1603).

21

### 5.    Dr. Steven Newman's Testimony: January 16, 2002

Dr. Steven Newman testified telephonically on January 16, 2002.  (TR 1638-58).  He

testified that Plaintiff's headaches and depression are subjective.  (TR 1644).  The doctor stated that

her multiple sclerosis is not a medical impairments because as he testified:

> the question of multiple sclerosis. . . . [he] use[d] the term question because, at best, it was possible.  And those medical complaints that she has had again have all been sensory.  She's complained of visual difficulties, spasms, and numbness, difficulty with balance periodically, but there's nothing in the records to further substantiate any of these types of problems.  And this includes and is not necessarily limited to the report of a Presskeyi eye [phonetic] examination going back to May 1995.  And that was in the treatment records through the Midwest Clinic.  And I believe that was Exhibit 19, but I had no stamped dates on the large portions of the records that I had in one of the handwritten notes.  There were additional studies that had been reported of March 18, 1997, which refers to a history of dizziness for which an electroencephalogram, an ENG, was reported by Dr. Desusa [phonetic].  This was also normal.  She'd had an EMG.  This of the legs, which was reported as normal because of her lower back complaints.  And she was treated at that time with Elavil for her depression.   Additional studies that were carried out relative to her head or multiple sclerosis include those of May 26, 1998, where there was also the history of an EEG having been performed and a CT or CAT scan of the head in 1997.  These were both normal, as well as evolt potential [phonetic], which were normal.  Now, typically, in an individual who has multiple sclerosis, some of the most sensitive tests would be the visual and brain stem evolt potential.  This would be Exhibit 19F.  And this was reported also in Dr. [U]'s report of August 11, 1998.  And again, he reports those as being normal, so all of those studies did not further substantiate the diagnosis of multiple sclerosis. . . .Dr. [U] did feel that this was a possible diagnosis and hence, began her in August 1998, on injections - - self-injections with a medication called Avonex.  Avonex is used for possible multiple sclerosis.  This was based upon the sensory complaints of the patient, fatigue, incontinence, the tingling in her arms and legs, and some tremulousness. . . . Tremors that she demonstrated at that time and on the basis of an MRI, which showed several, deep white matter abnormalities as he interpreted it.  However, as I look back at the MRI to which he was referring, Exhibit 4F, page one, June 14, 1998, from Oakwood Hospital, as interpreted by Dr. [U], they note that there are two focal white matter hyper-intensities in . . . both the right and left cerebral hemispheres.   Now, this is not typical of MS.  And in fact, with her other history related to substance abuse and/or headaches, this may be consistent more with that, so I'm not saying that Dr. [U] had misdiagnosed.  I'm only saying that, at best, this would be considered a possible diagnosis of MS.  Further, from the standpoint of your question of functional impairment, at this point, there was nothing in the records and I reviewed, as I said,

> several - - I would assume that there must be 100 to 150 pages here.  But there - - of all the records, there is no mention at all of any functional impairment.  In fact, it's repeated over and over that neurologically, she is stable.  And in addition, I just reviewed Exhibit 22F to bring me up to date.  And while I am aware that this was more related to her abdominal complaints as of 12/29/2001, again there's nothing in these records to indicate functional limitations or other neurological findings as the time of her general physical examination, so I would have to say at the time of her general examination . . . even if there were MS present, . . . I cannot identify any functional limitations related to it.

(TR 1641-44).  The doctor testified that he did not believe that Plaintiff had a medical impairment of multiple sclerosis.  (TR 1645).  He went on to explain that he did not

> feel that there were any conflicts in the medical evidence . . . regarding her treatment, usually possible MS - - one reserves treatment prior to starting the patient on other items. [He thought] that based upon what [he saw] in terms of the totality of the medical record that Dr. [U] may not have had available and knowing all of the details that go back at least seven years or so of the records that we had available with the normal CT scans, the volt potentials and the like.  That, at best, when one uses the term multiple sclerosis, there are three stages: possible, probable, and definite.  She has never proceeded in any of this time from that of, at best, possible and there were no other diagnostic studies that would change that impression.  At this point, even in the face of the use of Avonex and certain prior to it - - if that were an accurate diagnosis - - that we would have - - expect to see a change at this point.

(TR 1647).  He stated that she did have a medical impairment relating to degenerative disc disease.  (TR 1645).  However, he stated that none of her impairments, individually or in combination, equaled a listed impairment.  (TR 1647-48).

Dr. Newman concluded that her functional limitations were as follows: "prolonged sitting related to her degenerative disc disease.  Prolonged sitting being typically periods greater than two hours without a change in position."  (TR 1648).  He added that plaintiff would be capable of a "full level' of exertion with the limitation noted above.  (TR 1650).  Dr. Newman stated that her impairment was of this severity beginning March 18, 1997, when an EMG referenced her spondylothesis, and was permanent in nature.  (TR 1650-51).

23

Dr. Newman's testimony was incomplete due to the absence of some medical records and was continued on March 18, 2002.  (TR 1653-58, 1665).

### 6.    Dr. Steven Newman's Testimony: March 18, 2002[7]

After receiving the additional medical records, Dr. Newman testified again on March 18, 2002. (TR 1665-97).  The doctor testified that Plaintiff had possible MS, pulmonary problems, and psychiatric complaints. (TR 1667-68).  He stated that her complaints of spasm, visual problems, and imbalance are part of what lead to a diagnosis of multiple sclerosis. (TR 1668).  Dr. Newman stated that he did not "want to indicate that - - for the record that [he] feel[s] that this is the actual diagnosis.  She only has complaints and the complaints may be consistent with the multiple sclerosis."  (TR 1669).

Dr. Newman testified regarding the following complaints: "intermittent complaints related to spasm, visual complaints, and diminished balance.  However, the records do not document the frequency, the degree of severity of these, although she has received some medication for these complaints."   (TR 1667-68).  He stated that there was no objective evidence of her complaints regarding dizziness and visual change.  (TR 1670). He stated that

> the severity would be only as she has related historically and not something that has been able to be determined from a clinical standpoint.  Dr. U has noted that she did have in Exhibit 19F on August 11, 1998 a diagnosis of possible MS based upon the positive [inaudible], meaning that she demonstrated unsteadiness, which is under her control when putting her feet together.  There was end point nystagmus.  That would be the movement of the eyeballs back and forth when - - at the end of the gaze to the right or to the left that may be due to muscle imbalance and/or due to abnormal nerve input as with MS.  The other abnormality that was reported was brisk reflexes but no abnormal reflexes and it is only the basis of that clinical examination, which has not been reestablished at any time thereafter since  August 1998 or in - - that is in these

---

[7]To the extent that Dr. Newman's testimony overlaps with his previous testimony, same will not be repeated here.

other medical records right on through the present including those of Dr. Pearlson that would suggest any further abnormality. Hence, the degree or severity would have to be at best minimal. There are other diagnostic tests that were carried out going back to 1995, again in 1997 including a VOC potentials, Kresge Eye [phonetic] examination - Kresge Eye Institute examinations, all of which have been reported as normal and in someone with the diagnosis of MS of the degree or extent to which she has indicated symptomatically of this duration, these tests would reasonably be considered to have demonstrated abnormalities, which was not the case. I am aware that she has had two head CT scans, one or both of which have shown a single area of abnormality, which indicates a possibility of MS but cannot rule out other possibilities including those of what are called idiopathic, again in Exhibit 19F, idiopathic referring to nonspecific abnormality. It - - this area of abnormality is considered a very small one, two to three millimeters in the brain and there's not an abnormaility that is characteristic of and upon repeat study by way of MRI study according to Dr. U in 1998 and again fails to demonstrate the characteristic findings of longstanding MS if that were the diagnosis again suggesting that the degree or the severity by way of objective diagnostic tests again is lacking.

(TR 1670-71).

He found the following two impairments severe: possible multiple sclerosis and degenerative disc disease. (TR 1669-70). He based this finding regarding MS on her complaints to Dr. U and Dr. Voci as well as their clinical findings. (TR 1670-71, 1673). He concluded that the degree of severity of the MS and degenerative disc disease were "at best minimal." (TR 1671, 1672). He based his findings regarding her degenerative disc disease on Exhibits 19F and exhibits from the University of Michigan Hospital going back to 1994 and 1995. (TR 1671-72, 1675-76).

Dr. Newman testified that there were no conflicts in the medical evidence that affected his opinion. (TR 1672). He stated that based on his experience, education, training, and review of the medical evidence that Plaintiff's impairments did not individually or in combination meet or equal any listed impairment. (TR 1672-73).

He stated that she should "avoid working at heights or around extensive or moving machinery where she'd have to move rapidly where dizziness may become a problem on an

intermittent basis." (TR 1668, 1674). He stated that assembly lines should be also avoided when she is dizzy. (TR 1674). He found additional limitations to include "prolonged or repetitive activities involving bending at the waist, lifting extensive amounts, 20 pounds or greater, that is on an occasional or more frequent basis." (TR 1669, 1673-74). He stated that "even at the most severe, [the lifting requirement would be] occasional based upon the findings that [he saw] in [the] medical records, otherwise more commonly frequent. (TR 1674). He stated that Plaintiff could lift less than twenty pounds frequently. Id. Dr. Newman stated that there were no other limitations. (TR 1675).

Dr. Newman testified that the restrictions listed were "in response to the symptomology that [Plaintiff] indicated to the examining physicians." (TR 1687). Further, "to some extent if one believes that excessive activity maybe saw worsening of the spondylosis, then that would be of a prophylactic nature." Id. Dr. Newman testified that if she had marked tenderness and had to undergo treatment, e.g. physical therapy, she could still work within the twenty pound limit, but not as frequently. (TR 1687-88).

Upon further questioning by Plaintiff's counsel, Dr. Newman stated that an "x-ray of 5/10/95, [showed] first degree spondylolysis, no significant instability, rotoscoliosis," and explained that rotoscoliosis is "a twisting type of curvature," which in Plaintiff's case, tilts slightly to the right. (TR 1676). Plaintiff's attorney pointed out that Dr. Patel, a consultative examiner, stated that Plaintiff had spasm over the cervical and lumbar area. (TR 1676-78). Dr. Newman testified that "[a] spasm would tend to indicate that there has been an irritation of the muscle and a protection of the muscle where the muscle tries to protect itself by going into a spasm." (TR 1678). Dr. Newman also acknowledged that if Dr. Pearlson, Plaintiff's treating physician, also found spasms that would indicate "an ongoing finding, or at least [], at those two points in time" that noted same. (TR 1679).

26

Further, Dr. Newman testified that if Plaintiff suffered from "roping muscle spasms," it would require a need for greater restrictions than those previously testified to when muscle spasms are present.  (TR 1680-81).

Dr. Newman also stated that a "sit/stand option might be preferential" when considering chronic back pain.  (TR 1681).

Dr. Newman testified that when you first see a patient, you take a history of their presenting conditions, perform a clinical evaluation to make a basic diagnosis, and then sometimes take objective tests to rule out potential causes to confirm the diagnosis.  (TR 1681, 1688).  When asked whether he would be better able to place Plaintiff on restrictions if he had actually performed a clinical examination,[8] Dr. Newman testified that

> in some respects yes, in some respects, no.  At least I'd be able to answer the question better as to the consistency with which I would be in agreement with the other medical records.  However, I also had the opportunity looking back now over almost ten years worth of records as you pointed out and being able to determine the consistency, reliability and reproducibility of any findings that I might note and in that respect as I said the - - I think the records would tend to suggest that while she may have the observation of what has been interpreted as spasm.  Yeah.  And I use that term relatively loosely because it's always difficult for me short of calf spasm to identify spasm in other muscles, particularly spinal muscles because those are always so frequently more under the control of the direct voluntary aspects of ones behavior.  Calf spasm in the - - generally speaking, spasm is a condition that only lasts several seconds in duration, maybe 30 seconds or a minute at most and then the muscle relaxes so even if I were to assume that there was spasm and that it was noted or triggered by way of the range of motion studies and even if I did notice at the time of an examination, I would only be able to indicate that yes, it is triggered by such an incident or as many have been noted by way of these various other reports during those particular incidents and hence, partly my recommendation for the limitation of that type of activity that has resulted in triggering the spasm response.

(TR 1682-83).  Dr. Newman testified that as it relates to treating someone within the County

---

[8]The ALJ pointed out that if Dr. Newman had actually examined Plaintiff, he would not be able to testified as a medical expert.  (TR 1682).

Medical Program that Dr. U "did a very good job within the limitations obviously that he ha[d]." (TR 1692).

He later testified that an MS diagnosis is "based upon history, clinical findings and over the last ten to 15 years based upon the changes that occur within the MRI and also by way of less frequently over the last five to seven years also on the basis of cervical spinal fluid analysis and a VOC potentials." (TR 1688). The doctor reiterated that the radiologist performing the MRI in 1988 indicate[d] the possibility of demyelinating process including multiple sclerosis should be further evaluated." (TR 1689). Dr. Newman further testified that he sometimes reaches different interpretation than radiologists on x-rays of areas with which he is familiar. (TR 1691).

Upon questioning, Dr. Newman testified that one looks for visual difficulties, balance problems, complaints of numbness, complaints of fatigue, dizziness (sometimes), and incontinence in diagnosis MS. (TR 1693-1694). However, he stated that pain in the lower limbs is not characteristic of MS. (TR 1694). Further, he stated that lack of coordination is an indicator of MS in its earlier stages, rather than weakness, although it might depend on the way the patient is reporting the symptomology. Id. Dr. Newman explained that he would look for lack of

> coordination particularly in the arms and this [INAUDIBLE] take the form deterioration of handwriting, deterioration in ones ability to do fine coordination activities that they had been able to do previously, therefore resulting in their activities of daily living being limited, cooking, cleaning and the like. From the visual - - from the standpoint of the head, the speech becomes difficult to understand. There may be what's called a scanning speech as well as a hesitant speech, even some spasticity in word formation giving difficulty with speech. . . .The visual problems typically are some loss of vision unilaterally and/or double vision, which is persistent lasting several days in duration that gradually resolves.

(TR 1694-95).

Dr. Newman stated that when there is an episode associated with MS there is scarring or

residuals recognized with the help of MRI's, which is a relatively recent development in diagnosis. (TR 1695).  Further, Dr. Newman testified that "[o]ver the last 100 to 150 years, clinically we've suspected that there is [scarring], although a patient may experience improvement in their symptomology and now we see that there are what are called black holes or small areas of the brain that are showing abnormalities [primarily in the white matter, and sometimes found in the spinal cord and less frequently in the gray matter] by way of the MRI." Id.  Prior to MRI's, autopsy was the only method to determine same.  Id.

He explained that he prefers the term "muscle tightening' to "muscle spasm," albeit "with the exception of the fact that if [he] can't elicit a specific localized subcutaneous firmness that's sometimes associated with tenderness and then passes over a period of seconds."  (TR 1683-84). He stated that when reviewing records that use the term "muscle spasm," it indicates to him that there is "a localized area usually a pain . . . then a protective response by the patient preventing further movement."  (TR 1684; see also TR 1685-86).  He testified further that "[s]pasm is a temporary condition lasting several seconds in duration in which the muscle reflexively tightens and then relaxes.  And they can't retighten again immediately because of the spasm."  (TR 1685).  Dr. Newman stated that when a tightening is

> involuntary, typically what happens is that it does develop a spasm response where
> there is a subcutaneous actual elevation of the muscle that can be felt underneath the
> skin and typically sometimes may even result in a elevation as [sic] the surface of the
> skin.  In the spine it's most common to see the elevation but one can [INAUDIBLE]
> the specific muscle or region of muscle, which has gone into spasm and by keeping
> ones hand over for several seconds, in maybe ten or 15 seconds you can actually feel
> it begin to relax and then progress further.

(TR 1686).

Dr. Newman testified that he limited his testimony to the neurological and muscular skeletal problems that he identified in the record.  (TR 1675).  Further, he stated that he did not take into

29

account the pulmonary problems and psychiatric difficulties Plaintiff may have and their impact on her ability to perform work related activities.  (TR 1696).

### B.   MEDICAL EVIDENCE

Careful examination of the parties' briefs reveals that, in conjunction with the extensive record, an additional recitation of Plaintiff's medical history is not necessary.  Furthermore, the pertinent medical evidence relied upon by this Court is contained in the Analysis.[9]

### C.   VOCATIONAL EXPERT'S TESTIMONY

#### 1.   March 18, 2002 Hearing

Lee Koski, a vocational expert [VE], testified at the hearing.  (TR 1710-17).  He classified Plaintiff prior work as follows: companion at a senior citizen home, unskilled and light; cashier and food prep at Wendy's, semi-skilled and light; pulmonary specialist (medical coordinator), semi-skilled and light; and nurse's aide (if transferring patients without an assistive device) semi-skilled and medium.  (TR 1712-14).   The ALJ asked the VE to assume a claimant with Plaintiff's age, education, and work experience and to further assumed that such a claimant could

> perform work with the following restrictions, sit, stand, walk six of eight hours with a sit/stand option at will, no repetitive bending, twisting or turning of neck or body trunk, no unprotected heights, no work around moving machinery one could fall into, a relatively clean air environment, no frequent lifting over ten pounds, a simple, repetitive task.

(TR 1714).  The VE testified that such an individual could not perform Plaintiff's past relevant work.  Id.  However, the VE testified that the following unskilled and light position existed for such an individual: non-intervening guard, 2,000 positions.  (TR 1714).  The VE clarified that at the sedentary level there would be an additional  2,000 non-intervening guard positions and 2,000 hand

---

[9]See Section E infra, beginning at page 34.

packing and simple assembly positions. (TR 1714-15). The ALJ then asked the VE whether marked or extreme pain one to eight hours during a workday would impact the number of positions available if the pain interfered with one's ability to concentrate. (TR 1716). The VE testified that such a limitation would eliminate any work possibilities. Id.

Plaintiff's counsel then questioned the VE. (TR 1716-17). The VE clarified that the only non-exertional impairment considered was the pain, which would eliminate all the positions listed. (TR 1717).

### 2.    April 1, 1997 and June 9, 1997 Hearings

Richard Szydlowski, a vocational expert [VE], was present at the April 1, 1997 and June 9, 1997 hearings. (TR 141, 163-168.) At the hearing held on June 9, 1997, he classified Plaintiff's previous employment as semi-skilled and performed at the light exertional level. (TR 164). The ALJ presented a hypothetical question to the VE assuming that a claimant with Plaintiff's age, education, and work experience suffered from the symptoms described by Plaintiff and had the following limitations: no repetitive twisting or turning of the neck, no frequent bending at the waist, no overhead reaching, and no frequent lifting over ten pounds. (TR 165). Based on the above restrictions, the VE testified that separate from the position of fast food manager, Plaintiff could perform her past relevant work. Id. The ALJ gave a second hypothetical imposing the additional limitation of a sit/stand option for the claimant. (TR 165). The VE testified that jobs in this latter category existed in the following types and numbers in the regional economy: medical assistant, 2,000; receptionist/information clerk, 15,000; and telemarketer, 2,000. (TR 166).

Plaintiff's counsel also posed two hypotheticals to the VE. Plaintiff first incorporated the ALJ's second hypothetical, and asked the VE to assume that a claimant suffered intermittent periods

of depression two to three times per day requiring isolation for up to thirty minutes. (TR 166-67). The VE testified that no jobs would be available to such a claimant. (TR 167). Plaintiff gave a second hypothetical imposing the limitation of severe headaches one to three times per month, lasting two to three days, requiring a claimant to be absent from work approximately six to eight times a year. (TR 167-68). The VE testified that no jobs would be available due to excessive absenteeism. (TR 168).

> ### D.    ALJ'S CONCLUSIONS

> #### 1.    December 24, 2003, Decision

As stated, this case involves judicial review of two separate decisions of the Commissioner. ALJ Donahue was assigned determination of the Plaintiff's initial SSI and DIB applications on remand by the Appeals Council. (TR 1005-06, 1198-99). On December 24, 2003, ALJ Donahue issued two separate but virtually indistinguishable decisions. (TR 986-1004, STR 1022-39).

After reviewing the record medical evidence and testimony presented at the hearings, the ALJ found that Plaintiff suffered "severe" impairments of "possible multiple sclerosis, degenerative disc disease and depression," (TR 992-93, STR 1024). Nevertheless, the ALJ determined that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to, one listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (TR 992-93, STR 1003, 1024, 1038). The ALJ also found Plaintiff's testimony of pain, limitations and restrictions not fully credible. (TR 1003, STR 1038). Accordingly, she determined that Plaintiff could perform some light and sedentary work with the following restrictions:

> stand/walk six hours in an eight hour work day, sit six hours in an eight hour workday with a sit/stand at will option, with no repetitive bending, twisting or turning of the claimant's neck or body trunk; no unprotected heights; no work around machinery one could fall into; a relatively clean air environment, no frequent lifting

of over ten pounds; and simple, repetitive tasks.

(TR 1003, STR 1037-39).  Therefore, the ALJ concluded that Plaintiff was not disabled.

### 2.      June 25, 1997

It bears repeating that this case involves judicial review of two separate decisions of the Commissioner.  ALJ Donahue was assigned determination of the Plaintiff's initial SSI and DIB applications on remand by the Appeals Council.  (TR 450-51).  During the close of the first rehearing on April 1, 1997, however, the ALJ was informed that Plaintiff had filed a new SSI application prior to the Appeals Council remand.  (TR134-36).  As such, a hearing was also conducted on June 9, 1997.  (TR 138-69).  On June 25, 1997, ALJ Donahue issued two separate but virtually indistinguishable decisions.  (TR 25-37, 891-904).

After reviewing the record medical evidence and testimony presented at the hearings, the ALJ found that Plaintiff suffered "severe" impairments of asthma by history, scoliosis in the lumbar spine, substance abuse in remission, degenerative disc disease of the cervical spine, and depression. (TR 36, 903).  Nevertheless, the ALJ determined that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  (TR 36, 903).  The ALJ also found Plaintiff's testimony of pain, limitations and restrictions not fully credible.  Id.  Accordingly, she determined that Plaintiff could perform her previous light semi-skilled work that did not require: repetitive twisting or turning of the neck, frequent bending at the waist, overhead reaching, or frequent lifting over ten pounds.  Id.  Therefore, the ALJ concluded that Plaintiff was not disabled.  (TR 37, 903-04).

33

E.    **ANALYSIS**

Plaintiff contends in her Motion for Summary Judgment that substantial evidence does not exist to support the ALJ's decisions of December 24, 2003, because she: (1) erred in failing to consider Plaintiff's impairments in combination and (2) erred in rejecting the opinion of her treating physicians.[10]  In response, Defendant's Motion for Summary Judgment contends that the ALJ's decision is supported by substantial evidence.[11]  The matter is now ready for decision.

1.    **Standard of Review**

This Court's review of the ALJ's conclusions is limited.  First, this case was remanded and "[o]n the remand of a case after appeal, it is the duty of the lower court or the agency from which appeal is taken, to comply with the mandate of the court and to obey the directions therein without variation. . . ."  Davis v. Sec'y of Health and Human Servs., 634 F. Supp. 174, 178 (E.D. Mich. 1986) (quoting Mefford v. Gardner, 383 F.2d 748, 758 (6th Cir. 1967)).  The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g) (2006).  Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  It is more than a scintilla of evidence, but less than a preponderance of evidence.  Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989).  This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  Felisky v. Bowen, 35

---

[10]Plaintiff's Motion for Summary Judgment and Brief filed November 30, 2005 [hereinafter Plaintiff's Brief], at pages 5-30.  See also Plaintiff's Reply to Defendant's Motion for Summary Judgment and Memorandum in Support filed February 23, 2006.

[11]Defendant's Motion for Summary Judgment filed January 23, 2006 [hereinafter Defendant's Brief], at pages 10-16.

F.3d 1027, 1035 (6th Cir. 1994).  Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence.  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986).  Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  Applying these standards, I will analyze each of Plaintiff's claims.

### a.      Combination of Impairments

Plaintiff argues that ALJ Donahue failed to consider the combined effect of her impairments.[12]  Specifically, according to Plaintiff, the ALJ was required to consider her mental or non-exertional impairments, including depression, headaches, dizziness, and asthma.[13]  Further, Plaintiff alleges that the ALJ failed to properly consider her exertional impairments relating to her ability walk, stand, and sit as well as a lack of coordination in her hands and upper extremities.[14]  Accordingly, because the ALJ did not include restrictions relating to same in the hypothetical and RFC, Plaintiff alleges that the decision was not supported by substantial evidence.

It is well established that substantial evidence may be produced through reliance on a VE's testimony "in response to a 'hypothetical' question, but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments.'"  Varley v. Sec'y of Health and Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).  The hypothetical need only include those impairments which the ALJ accepts as true.  A hypothetical question to a VE may omit nonsevere impairments but must include those which the ALJ finds to be severe.  Reed v. Sec'y of Health and Human

---

[12]Plaintiff's Brief at pages 5-17.

[13]Plaintiff's Brief at pages 5-17.

[14]Plaintiff's Brief at pages 15-16.

Servs., 804 F. Supp 914, 924 (6th Cir. 1992).  There is no requirement that the ALJ's hypotheticals

to the VE reflect the claimant's unsubstantiated complaints.  See Hardaway v. Sec'y of Health and

Human Servs., 823 F.2d 922, 927-28 (6th Cir. 1987).  Nevertheless, as Plaintiff points out,[15]

> [i]n evaluating the evidence regarding appellant's impairments we note that in this circuit they must be viewed in combination. Disability may be established by a claimant suffering from a variety of medical problems no one of which might be sufficiently disabling to prevent substantial gainful employment, but when taken together have that result.

Mowery v. Heckler, 771 F.2d 966, 971 (6th Cir. 1985) (citing Hurst v. Schweiker, 725 F.2d 53 (6th

Cir. 1984); Allen v. Califano, 613 F.2d 139 (6th Cir. 1980)).  Further, "[w]hen multiple impairments

are involved, the assessment of RFC reflects the restrictions resulting from all impairments (both

severe and not severe impairments).  This assessment is based on all relevant evidence pertaining

to RFC consistent with appropriate clinical and laboratory findings," according to SSR 86-8.[16]  1986

WL 68636, at *5.  The undersigned suggests that the ALJ failed in this assessment and further failed

to discuss the impairments, both severe and non severe, as well as both exertional and non

exertional, in isolation.

### i.      Depression

In a prior Report and Recommendation, the undersigned suggested that the case be remanded

to ALJ Donahue, in part, because

> the ALJ did not reject the opinions contained in either the  November 1993 or May 1996 psychological evaluations.  Instead, the ALJ discussed the most favorable portions of the reports of both psychiatrists in her opinion.  The ALJ did not mention the November 1995 consultive report.  Similarly, the ALJ did not specifically discuss

---

[15]Plaintiff's Brief at pages 12-13.

[16]Plaintiff's Brief at page 13.

any of the estimated GAF[17] scores in her written decision.

(TR 966).  This recommendation was adopted by the District Court on March 31, 2000.  (TR 1026-

27).  However, the ALJ failed to discuss the November 1995 consultative report again.  (TR 755-

57).  ALJ Donahue did discuss a subsequent consultative report of April 1999.  (TR 1033, 1103-05).

Although, the ALJ found Plaintiff's depression severe, Plaintiff argues that the ALJ failed

to translate that into any concrete limitations.[18]  Defendant argues that the ALJ did translate same

in limiting Plaintiff to "simple repetitive work."[19]  Further, Defendant argues that "six reviewing

psychologists and psychiatrists [] opined that Ms. Gore could perform simple work, or that she did

not even have a severe mental impairment."[20]  Defendant argues that these opinions are

"uncontradicted."[21]  However, the consultative report of 1995 gave a "guarded" prognosis.  (TR 755-

57).

On Psychiatric Review Technique Forms [PRTF] in 1999 and 2000, it was reported that

Plaintiff "often" suffered from "deficiencies of concentration, persistence or pace resulting in failure

to complete tasks in a timely manner."  (TR 1113, 1159).  Further, the ALJ found that Plaintiff

---

[17]Since the prior Report and Recommendation by the undersigned, the Sixth Circuit has held that GAF's do not necessarily have to be included in the RFC.  "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.  Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."  Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002).  Further, the ALJ referenced the GAF findings in his discussions of the Plaintiff's psychological well being.

[18]Plaintiff's Brief at pages 6-7.

[19]Defendant's Brief at page 13 (citing TR 1714).

[20]Defendant's Brief at page 13 (citing TR 241, 258, 536, 572, 1116, 1149).

[21]Defendant's Brief at page 13.

suffered from "moderate difficulties in maintaining concentration, persistence or pace." (TR 993, STR 1028). The undersigned is familiar with the issues relating to incorporation of same into questions to a VE.

In Smith v. Halter, 307 F.3d 377, 379 (6th Cir. 2001), the Plaintiff also was reported on the PRTF to have " difficulties concentrating "often" that resulted in a failure to complete work in a timely manner. The ALJ in Smith based his finding on the testimony of four physicians who found the plaintiff's concentration difficulties to be "minimal or negligible." Id. Further, the ALJ in Smith rejected the opinion of the fifth physician who stated that the plaintiff could not work due to his "inability to concentrate." Id. The court in Smith stated that the ALJ accurately characterized the plaintiff's limitations in that case, by "limiting him to jobs that are routine and low stress, and do not involve intense interpersonal confrontations, high quotas, unprotected heights, or operation of heavy machinery." Id. at 378. Also, the Smith court found that the ALJ properly evaluated the plaintiff's mental impairments under Varley. Smith, 307 F.3d at 379. Therefore, the court found that because the ALJ incorporated both concentration difficulties and problems related to timely completion of tasks as a result, the ALJ's decision was supported by substantial evidence. Id. at 379-80.

More recently, one district court within the Eastern District of Michigan has interpreted Smith, stating that "the Sixth Circuit has [] held that an ALJ's failure to include in a hypothetical question a PRTF finding that a claimant 'often' has difficulty concentrating is not a basis for remand when the hypothetical question adequately describes that claimant's limitations arising from a mental impairment." Edwards v. Barnhart, 383 F. Supp. 2d 920, 929 (E.D. Mich. 2005) (Hon.

38

Friedman, B. A.) (citation omitted).[22]  However, the district court held that

> while finding that Plaintiff has a "moderate limitation in her ability to concentrate,
> persist and keep pace," the ALJ's limitations were with co-workers, supervisors and
> the public, and to "jobs entailing no more than *simple, routine, unskilled work*" (R.
> 18-19, 248). While close, these are *not sufficient*, and do not fully convey Plaintiff's
> limitations in concentration to the VE.  See Keyser, No. 03-60078; c.f. Webb v.
> Commr of Soc. Sec., 368 F.3d 629, 633 (6th Cir. 2004).  Plaintiff may be unable to
> meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled,
> routine job. The current hypothetical question is not adequate on the issue of
> moderate limitations of concentration, persistence and pace for this Court to have any
> idea as to the number of the assembly, packing, and sorting or security guard jobs
> identified by the VE that would be excluded if quotas or other aspects related to
> moderate concentration limitations were added to the hypothetical question.  Each
> of these jobs seems to require a degree of sustained concentration, persistence and
> pace. The ALJ's argument that Plaintiff's daily watching of television is not
> sufficient evidence on this record to conclude her concentration is not significantly
> impaired. Thus, the ALJ's hypothetical question is insufficient.

Id. at 930-31 (emphasis added).  Further, in Edwards, the district court found that "[u]nlike the

Smith case, the present case does not include 'the testimony of four physicians who characterized

[the Plaintiff's] concentration problems as minimal or negligible."  Id. at 930.

Even more recently, however, a district court for the Eastern District of Michigan has stated

that, "while the ALJ checked the 'often' box on the PRTF, his more specific and detailed assessment

of Plaintiff's mental limitations noted a dearth of objective medical findings or treatment records that

would support a finding of a major impairment in this area," and  interpreted

---

[22]The undersigned recognizes  "district judges in this circuit must not treat decisions by other
district judges, in this and a fortiori in other circuits, as controlling, unless of course the doctrine of
res judicata or of collateral estoppel applies. Such decisions will normally be entitled to no more
weight than their intrinsic persuasiveness merits."  TMF Tool Co., Inc. v. Muller,  913 F.2d 1185,
1191 (7th Cir. 1990) (quoting Colby v. J.C. Penney Co., Inc., 811 F.2d 1119, 1124 (7th Cir.1987)
(emphasis in original)).  See also Liebisch v. Sec'y of Health and Human Servs.,  21 F.3d 428, 1994
WL 108957, *2 (6th Cir. 1994).

> Smith and the other pertinent precedents as dictating that the focus be on the ALJ's detailed assessment of a claimant's limitations, as opposed to the ALJ's broad characterization of the claimant's deficiencies on the five-point PRTF scale. To be sure, all of the ALJ's findings, including those summarized on a PRTF, must be harmonized and incorporated into the hypothetical questioning of the VE. Yet, a particular assessment on a PRTF does not mandate a rigid checklist of restrictions that must be included in this questioning. Rather, a case-by-case determination is required, under which the ALJ must translate the broad PRTF classifications into a set of specific limitations that are properly rooted in the administrative record. Here, the Court finds that the ALJ properly carried out this function upon remand, and that his resulting decision should be affirmed as based upon substantial evidence.

Bohn-Morton v. Comm'r of Soc. Sec., 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005) (Hon. Rosen, G. E.).

However, additional case law from this district suggests that more often than not, a simple and routine task limitation is insufficient to support a limitation of "often" having difficulty in concentration, persistence, or pace for the purposes of establishing substantial evidence.

> Courts have found that hypotheticals limiting a worker to "unskilled work" have not been sufficient to accommodate certain psychological limitations. Newton v. Chater, 92 F.3d 688 (8th Cir. 1996), held that a reference merely to "unskilled sedentary work" in a hypothetical question is insufficient to describe and accommodate concentration deficiencies; see also McGuire v. Apfel, 1999 WL 426035, at *15 (D. Or. 1999). This Court in Bielat v. Comm'r of Soc. Sec., 267 F. Supp. 2d 698 (E.D. Mich. 2003) (quoting Andrews v. Comm'r of Soc. Sec., No. 00-75522 (E.D. Mich. December 18, 2001) [sic]) and citing Thomczek v. Chater, 1996 WL 426247 (E.D. Mich. 1996), has held that a hypothetical question including "unskilled sedentary work" plus the limitation of "jobs low at the emotional stress level" is not sufficient to accommodate a finding of a "marked" limitation in ability to concentrate or persist at tasks.

Eiseler v. Barnhart, 344 F. Supp. 2d 1019, 1029 (E.D. Mich. 2004) (Hon. Fiekens, J.).

Further, in Bielat v. Comm'r of Soc. Sec., 267 F. Supp. 2d 698, 702 (E.D. Mich. 2003) (Hon. Cohn, J.), the District Court stated

> [i]n general, a reference to "unskilled, sedentary work" is not sufficient to describe deficiencies in concentration. See Newton v. Chater, 92 F.3d 688 (8th Cir.1996)

40

(holding that a reference to "simple jobs" was insufficient to constitute inclusion of the impairments or deficiencies in concentration noted by the ALJ); McGuire v. Apfel, 1999 WL 426035 at *15 (D. Or. 1999) (holding that "simple work" was insufficient to describe claimant's deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner). The Commissioner notes that unskilled work by definition involves little judgment to perform simple duties that can be learned on the job in a short period of time. See 20 C.F.R. § 404.1568(a)(2001).

The question remains whether the omission of the 1995 consultative report from the ALJ's analysis is enough to result in a remand in the present case due to a lack of substantial evidence. Again, it must be more than a scintilla of evidence, but less than a preponderance of evidence. Brainard, 889 F.2d at 681. The ALJ's findings regarding Plaintiff's depression as it relates to concentration are further complicated by the potential inconsistencies with simple and repetitive tasks. Nevertheless, because this case was remanded, as previously stated, the ALJ should have followed the District Court's order without derivation. The ALJ failed to do so.

### ii.    Dizziness and Headaches

Plaintiff's argues that the ALJ failed to properly evaluate her headaches and dizziness.[23] Although complaints of pain and dizziness are documented in the record, the undersigned previously found that substantial evidence exists to support the ALJ's decision not to include a reference to Plaintiff's dizzy spells in her hypothetical. (TR 970-73).

Defendant contends that Plaintiff has not submitted any "new evidence supporting her allegations" relating to dizziness and headaches and reasonably accommodated same in limitations "to no work at heights or around moving machinery."[24] Although the undersigned agrees that the

---

[23]Plaintiff's Brief at pages 11-15.

[24]Defendant's Brief at pages 14 (citing TR 1714).

ALJ reasonably accommodated same, it is noted that Plaintiff did submit additional records from 1995 until as recently as 2003, documenting complaints of headaches, dizziness, and medication for same. (TR 1179, 1180-82, 1186-91, 1228, 1236, 1247, 1250-54, 1264, 1266, 1269, 1273-77, 1295, 1301–02, 1303, 1316, 1319, 1324-25, 1335-36, 1338-39, 1343, 1351, 1354-56, 1357, 1363, 1443, 1446-53, 1456-61, 1464-66, 1501-02, 1508-09, 1511,  1513-14, 1565-66).

The undersigned based the previous findings on a lack of objective medical evidence to support debilitating headaches and dizziness.  (TR 970-73).  Although the ALJ restriction" to no work at heights or around moving machinery," accommodates her dizziness, there are no accommodations made for her headaches.  (TR 1001, 1003, STR 1036, 1038).

However, Dr. Joel Pearlson, a family practitioner, and Dr. James Voci, an adult neurologist, both testified regarding the nature of Plaintiff's headaches.  (TR 1390-91, 1397-99, 1419-20, 1428-30).  Pearlson testified that same were "a combination of muscular skeletal strain, vascular type headaches, an overlay from muscular sclerosis."  (TR 1397).  Further, he stated that "objective radiologic tests. . . can ascertain whether they're intracranial lesions, carious X rays examining the cervical spine for irregularities in the skeletal spine as a source of these headaches."  Id.  He stated that an absence of intracranial lesions does not negate the possibility of headaches.  (TR 1398).  In addition, he stated that physical examination is used to "rule out the possible presence of an intracranial lesion or spinal lesion that would suggest the cause of the headache; if that investigation is negative, then a selection of different medication most appropriate to the circumstances of the headaches is offered to the patient."  Id.  Dr. Perlson went stated that her headaches began in 1993 after a physical assault.  (TR 1408-09).  Dr. Perlson stated that Plaintiff has "verbally communicated" her need to go into "a dark with the door closed and the lights out," but her

42

headaches range from requiring same to simply being "annoying."  (TR 1409).

Dr. Voci testified that he depends upon Plaintiff's description of her headache and clinical examination in diagnosing same.  (TR 1429-30).  He stated that "[h]er headache diagnosis is that of a cervical terdicatnic, t-e-r-d-i-c-a-t-n-i-c or muscular tension type headache, the main secondary migraine component to it, but most of them are predominantly tension type headaches."  (TR 1428-29).  He stated that her headaches are "[q]uite frequent [and] flare up with her depression."  (TR 1429).  He stated that she treats her with Esgic and some muscle relaxants.  Id.  When asked by Plaintiff's counsel about objective evidence of same, Dr. Voci stated that he

> depend[s] on her description of the headache type, and since there are different types of headaches, it's hard for the patient to fake a headache diagnosis because of the symptoms they give us.  Her symptoms fit most classically with tension type headache.  her exam is notable for spasms in the upper, cervical spine, the cervical parastinial, p-a-r-a-s-t-i-n-i-a-l, cervical parastinial muscles.

Id.  He would restriction Plaintiff's work activities to no activities that would "require her to turn her head or hold her head at an angle, such as typing or using the telephone."  (TR 1430).  Thus, unlike the undersigned's prior examination of the record, there are at least the opinions of the treating physician's regarding Plaintiff's headaches and objective testing, or lack thereof.  The ALJ failed to acknowledge headaches as a severe impairment and dismissed the opinions of Dr. Perlson and Dr. Voci summarily as will be more fully discussed below.[25]

### iii.   Asthma

Plaintiff argues that the ALJ again failed to properly consider her asthma because he found that it was not severe and simply limited her to a relatively clean air environment.[26]   Further,

_____

[25]See infra beginning at page 46.

[26]Plaintiff's Brief at page 16.

Plaintiff points out that in the prior decision, the ALJ found that the asthma was severe, but that it did not require any work related restrictions.[27]   However, as Defendant points out:

> But as the ALJ granted Ms. Gore a functional limitation due to asthma–limiting her to work in a relatively clean environment (Tr. 1714)–any error in failing to include asthma in the listing of severe impairments is harmless.  See Heston v. Comm'r of Soc. Sec., 245 F.3d 5[2]8, 535-36 (6th Cir. 2001) (ALJ's failure to discuss treating physician's opinion was "harmless error" where ALJ's hypothetical question incorporated treating physician's opinion).[28]

Further, Plaintiff does not allege greater restrictions relating to her asthma; rather she argues that her need for a clean air environment is an ongoing restriction.  There is no reason to think that the ALJ's restriction is not ongoing.

### iv.     Pain

Plaintiff argues that "[w]hen claimant's pain affected her concentration there were no jobs she could perform."[29]   However, Plaintiff makes no further argument regarding same and "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to. . . put flesh on its bones."  McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997) (citations omitted).

---

[27]Plaintiff's Brief at page 16.

[28]Defendant's Brief at page 14.

[29]Plaintiff's Brief at page 15.

### v.        Walking, Standing, and Sitting

Plaintiff argues that the ALJ erred in finding that she could walk, sit, or stand six hours in an eight hour workday.[30]  Plaintiff argues that the ALJ's conclusions in this regard are contrary to the findings Dr. Perlson and Dr. Voci.[31]  Thus, a discussion of same is more properly examined with the opinions of Plaintiff's treating physicians', which are analyzed below.[32]

### vi.        Hands and Upper Extremities

Plaintiff alleges that she "experienced spasms in her hands, dropped items and wore braces."[33]  Plaintiff points out that when the VE was questioned regarding "[a] limitation of no repetitive hand movements" that the packing jobs were all eliminated.[34]  However, even though the ALJ included same her decision, a significant number of jobs still existed if the packing jobs were eliminated   (TR 1002, 1004, STR 1038-39),   because the remaining 4,000 positions provide a substantial number of jobs under Hall v. Bowen, 837 F.2d 272, 274-75 (6th Cir. 1988) (finding that between 1,350 and 1,800 jobs in the region was sufficient, although there is no "special number").  Thus, any argument in this regard is simply result in harmless error.

---

[30]Plaintiff's Brief at page 15.

[31]Plaintiff's Brief at page 15 (citing TR 1003, 1387-1412, 1416-1436, 1641).  Plaintiff also notes the opinion of Dr. Derandi, but this single citation to the opinion of Dr. Derandi is based on subjective pain complaints and unsupported by objective clinical data.  Plaintiff's Brief at page 15 (citing TR 809, 810).  Further, Plaintiff notes that "Dr. Mellon had x-ray findings of degenerative disc disease at L5-S1," but only cites to the hearing transcript as evidence of same and not to any medical records.  Plaintiff's Brief at page 15 (citing TR 1641).  Thus, the opinion of same will not be discussed further.

[32]See infra beginning at page 45.

[33]Plaintiff's Brief at page 15 (citing TR 1581).

[34]Plaintiff's Brief at page 15-16 (citing TR 1715).

### b.    Treating Physicians

Plaintiff alleges that the ALJ failed to accord appropriate weight to the opinion of her treating physicians.[35]  The medical opinions and diagnoses of treating physicians are entitled to substantial deference, particularly if those opinions are uncontradicted.  King v. Heckler, 742 F.2d 968, 974-75 (6th Cir. 1984).  However, this is true only if the treating physician's opinion is based on sufficient medical data.  See 20 C.F.R. § 404.1529.  It is often misunderstood that the determination of disability is the prerogative of the Secretary, and not the treating physician.  Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 538 (6th Cir. 1981); Duncan v. Sec'y of Health & Human Servs., 801 F.2d 847, 855 (6th Cir. 1986); 20 C.F.R. § 404.1527(e)(2).  An ALJ may reject a physician's opinion when it is brief, conclusory, or not supported by medically acceptable clinical or laboratory diagnosis techniques.  20 C.F.R. § 404.1527(d)(2).  Accordingly, treating physicians' opinions must be grounded on objective medical evidence, and no deference need be afforded those opinions if they are simply conclusory.  Houston v. Sec'y of Health and Human Servs., 736 F.2d 365, 367 (6th Cir. 1984); Duncan, 801 F.2d at 855 (citing King, 742 F.2d at 973).  In other words, the weight to be given a doctor's opinion by an ALJ will depend on the extent to which it is supported by "specific and complete clinical findings."  Giddings v. Richardson, 480 F.2d 652, 656 (6th Cir. 1973).  See also, Cutlip v. Sec'y of Health and Human Servs., 25 F.3d 284, 287 (6th Cir. 1994) (citing Young v. Sec'y of Health & Human Servs., 925 F.2d 146, 151 (6th Cir.1990)).

In Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004), the Sixth Circuit found that an ALJ must give "good reasons" for rejecting a treating physician's opinion.  Wilson, 378 F.3d

---

[35]Plaintiff's Brief at pages 18-20.

at 544.  However, the Regulations clearly state that, "[a] statement by a medical source that you are

'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  20

C.F.R. § 404.1527(e)(1).  Nonetheless, although an ALJ is not required to discuss each and every

piece of evidence, he or she "may not pick and choose the portions of a single report, relying on some

and ignoring others, without offering some rationale for his decision."  Young v. Comm'r of Soc. Sec.,

351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).

Unfortunately, ALJ Donahue did just that.  She stated in her decisions that Dr. Perlson's

opinion is unsubstantiated because

> there is no medical evidence to support [his] drastic restrictions.  The objective
> testing cit[ed] by Dr. Perlson is that the claimant has exhibit marked tenderness in
> the sacroiliac joints.  Dr. Perlson opines that multiple sclerosis is clinically diagnosed
> rather than objectively in contradiction to the findings on MRI that specialists refer
> to in their diagnosis.

(TR 999, STR 1034).  The ALJ goes on to state that "Dr. Perlson does state that the claimant's

headaches are not consistently restrictive, stating that the claimant's headaches take on different

presentations - anywhere from annoying to restricting her activity to a dark room." (TR 999, 1409).

However, Dr. Perlson also stated that objective evidence of the headache is not always possible and

the absence of same is not always conclusive.[36]  However, the ALJ leaves out this part of the

testimony.  Further, he does not reject that Plaintiff's headaches do at some times require her to go

into a "dark room."  The ALJ also acknowledges that Plaintiff testified that she has headaches every

day.  (TR 994, 1029).  However, the ALJ found that Plaintiff is "not totally credible."[37]

---

[36]See supra at page 41-43.

[37]Plaintiff does not make any specific arguments regarding the ALJ's credibility
determination pursuant to Duncan v. Sec'y of Health and Human Servs., 801 F.2d 847, 853 (6th
Cir.1986) or 20 CFR § 404.1529(c)(3); therefore, the undersigned will not discuss same.  The "ALJ's

The ALJ also stated that Dr. Perlson restricted Plaintiff to "standing, walking or sitting for an hour each," but found a lack of "objective medical findings this extensive."  (TR 998, STR 1003-34).  However, the ALJ does not explain adequately how she gets from this treating physician's opinion to an RFC that includes five additional hours of sitting, standing, and walking each day.  (TR 1001, 1003, STR 1036, 1038).

The ALJ also discusses Dr. Voci's opinion and summarized his findings regarding Plaintiff's headaches as follows: "[t]he claimant has cervical muscle tension headaches that flare up with depression.  He said that the claimant cannot perform activities requiring turning of the head or holding the head at an angle.  She must avoid stressful situations."  (TR 999).  However, the ALJ neither accepted or rejected this opinion or the restrictions related to same.  Rather, the ALJ just reiterated the testimony in this regard.

Defendant argues that there is not a problem with the ALJ's treatment of the treating physicians' opinions because the decision is "relatively consistent" with same and further supported by Dr. Newman's opinion.[38]   However, specifically looking at Dr. Voci's opinion regarding headaches, it is clear that the ALJ did not include the restrictions cited by the doctor in the RFC or hypothetical to the VE.  Thus, it is inconsistent with those findings, and not "relatively consistent."

_____

findings based on the credibility of the applicant are to be accorded great weight and deference." Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997) (citation omitted).  It is noted that the ALJ points out that Dr. Voci made notes on March 3, 2000, that "the pharmacy notified [his office] that [Plaintiff] added another digit to the number of pills prescribed on her last Esgic prescription. . . [s]he claims here too that she is out of Restoril even though she has one refill left. She claims that the pharmacy claims that there are no refills left."  (TR 994, 1029, 1236).  Nevertheless, Dr. Voci still testified that she suffered from disabling impairments in 2002.  (TR 1417-36).

[38]Defendant's Brief at pages 11-13.  The ALJ's reliance on the consulting neurologist, Dr. Newman, does not excuse her duty to follow regulations and Sixth Circuit case law.

The undersigned recognizes that in <u>Wilson</u>, the Sixth Circuit went on to state

> [t]hat is not to say that a violation of the procedural requirement of § 1527(d)(2) could never constitute harmless error.  We do not decide the question of whether a de minimis violation may qualify as harmless error.  For instance, if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal.  <u>NLRB v. Wyman-Gordon, Co.</u>, 394 U.S. 759, 766 n.6, 89 S. Ct. 1426, 22 L.Ed.2d 709 (1969) (plurality opinion) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game"). There is also the possibility that if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant.  Or perhaps a situation could arise where the Commissioner has met the goal of § 1527(d)(2)-- the provision of the procedural safeguard of reasons--even though she has not complied with the terms of the regulation.

<u>Wilson</u>, 378 F.3d at 547.  However, as previously pointed out the ALJ's findings are not consistent with Dr. Voci or Dr. Perlson's opinion, and their opinion is not irrelevant; thus, the harmless error exception in <u>Wilson</u> is not applicable.  The Sixth Circuit has held that,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion. <u>Id.</u>

<u>Wilson</u>, 378 F.3d at 544.  The ALJ repeatedly stated that objective medical evidence did not support restrictions as "extensive" as Dr. Perlson found.  However, the ALJ makes no such reference to the restrictions of Dr. Voci.  The ALJ did acknowledge that Dr. Voci "is a neurologist who is board certified as well in electromyelography;" however, she failed to analyze any other factors under <u>Wilson</u>.  (TR 999, STR 1034).  The ALJ simply did not comply with the mandates of § 1527(d)(2) as illustrated in <u>Wilson</u>.

49

2.        **Remand Versus Benefits**

The remaining issue is whether remand or an award of benefits is the appropriate remedy for Plaintiff.  It is firmly established that under § 405(g), a court may remand for an award of benefits "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  Faucher v. Sec'y of Health & Human Servs., 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted).  More specifically, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking."  Id. (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

Unfortunately, the ALJ's adverse decision was deprived of substantial evidentiary support because she failed to evaluate all the evidence of record relating to Plaintiff's exertional and nonexertional impairments, either in isolation or combination.  Specifically, the ALJ did not review the record in the manner dictated by the District Court in its Order and Judgment of March 31, 2000 adopting the undersigned's Report and Recommendation of February 29, 2000.  (TR 951-75, 1026-27).  Further, she did not properly evaluate the treating physicians' opinions under § 1527(d)(2) or Wilson.  This case should be remanded to allow the ALJ to re-evaluate the evidence of record and properly assess Plaintiff's RFC and form a proper hypothetical reflecting same.  In addition, the ALJ should be given an opportunity to properly examine the treating physicians' opinions.  Therefore, a remand for benefits would be premature, unfortunately resulting in protracted review of this matter.

III.   **CONCLUSION**

For the reasons stated above, I respectfully recommend that the court **GRANT IN PART** and **DENY IN PART** Plaintiff's Motion for Summary Judgment, **DENY** Defendant's Motion for

50

Summary Judgment, and **REMAND** this case to the Secretary for a proper record assessment of the Plaintiff's exertional and nonexertional limitations, and to determine whether Plaintiff retained the RFC to perform her past relevant work in accordance with the agency's regulations.

I further recommend that the Court order the Secretary give this case priority upon remand based on the protracted procedural history of this case. In so doing, this Court intimates no view as to whether Plaintiff is indeed "disabled" within the meaning of the Social Security Act.

Pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objections within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals. United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981).

In accordance with the provisions of Fed. R. Civ. P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.


s/Wallace Capel, Jr.
**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**Dated:**   August 16, 2006

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**<u>CERTIFICATE OF SERVICE</u>**


I hereby certify that on <u>August 16, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>James A. Brunson and Ronald D. Glotta,</u>

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606</u>



<u>s/James P. Peltier</u>
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail: pete_peltier@mied.uscourts.gov